UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID D. HARRIS,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>DR. STEPHEN MAYERI,<br><br>　　　　　Defendant. | Case No.  20-cv-07233-SI (pr)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 17 |

David D. Harris filed this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983. This action is now before the court for consideration of the motion for summary judgment filed by defendant. Even though Harris was given an opportunity to file an opposition, he has not done so. For the reasons discussed below, summary judgment will be granted in defendant's favor.

## BACKGROUND[1]

A.　　The Parties

The events and omissions giving rise to this action occurred in the period from February

_____

[1] This order includes many acronyms.  Here, in one place, they are:

| | |
|---|---|
| CDCR | California Department of Corrections and Rehabilitation |
| DBT | dialectical behavior therapy |
| EOP | Enhanced Outpatient Program |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinarian Treatment Team |
| LOC | level of care |
| M-FAST | Miller Forensic Assessment of Symptoms Test |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| SSRI | selective serotonin reuptake inhibitor |
| SVSP | Salinas Valley State Prison |

United States District Court<br>Northern District of California

through May 2019, at the Salinas Valley State Prison ("SVSP").  At the relevant time, Harris was a prisoner of the State of California and had been transferred from another prison to SVSP on February 12, 2019 after he was deemed to be a danger to himself.  Mayeri Decl. ¶ 9.  Also at the relevant time, Dr. Stephen Mayeri, the sole defendant in this action, worked as an SVSP staff psychiatrist and was assigned to Harris' Interdisciplinary Treatment Team ("IDTT").  *Id.* ¶¶ 1-2, 6, 9.

B.     The Dispute

The claim that remains for adjudication asserts that Dr. Mayeri was deliberately indifferent to Harris' medical needs.[2]  Harris seeks monetary and punitive damages.

Specifically, the parties disagree as to the level of mental health care provided to Harris. Harris alleges that Dr. Mayeri failed to provide constitutionally adequate care by refusing to increase the level of mental health care provided to Harris, failing to prevent Harris' suicide attempt, and ending Harris' prescription for bupropion, an antidepressant.  *See* Docket No. 1.  Meanwhile, Dr. Mayeri argues the evidence does not support Harris' claims.  Docket No. 17 at 5.  Rather, Dr. Mayeri claims that the evidence reveals that Harris was "already being provided with inpatient psychiatric care—the highest level of mental health care provided by CDCR," and that Dr. Mayeri was responsive to Harris' mental health needs by meeting with him multiple times a week and repeatedly adjusting medications to accommodate his complaints.  *See id.*

C.     Plaintiff's Version

The following background is taken from the court's order dated January 20, 2021, which described Harris' claims as follows:

Harris suffers from a long history of mental illness that has caused him to be a danger to himself and others.  Sometimes he has auditory hallucinations that make him want to kill himself.  Dr. Stephen Mayeri, a psychiatrist at SVSP State Prison, was aware of Harris' danger to himself.  Dr. Mayeri petitioned the treatment team to reduce Harris' level of care, even though he knew Harris was a danger to himself.  (Exhibits to the complaint indicate that this happened in about March 2019.  *See* Docket No. 1

---

[2] Upon initial review, the court determined that the complaint stated a § 1983 claim against Dr. Mayeri for deliberate indifference to Harris' medical needs, and dismissed all other claims and defendants.  *See* Docket No. 7 at 4.

at 8, 10.)  As a result, Harris' level of care was reduced to a level that could not meet his mental health needs.  Dr. Mayeri's failure to treat Harris properly and to keep him away from sharp objects allowed Harris to cut his wrists and bang his head.  *Id.* at 3.  If Dr. Mayeri had "not improperly and prematurely discharged" Harris, Harris might not have hurt himself.  *Id.* at 4.

Docket No. 7 at 1.

D.      Defendant's Version

        1.      The CDCR's Mental Health Services Delivery System

        The California Department of Corrections and Rehabilitation ("CDCR") Mental Health Services Delivery System ("MHSDS") provides inmates, like Harris, access to mental health services.  Wu Decl., Ex. C at 3.  The MHSDS provides four levels of care, and an inmate must meet certain specific treatment criteria to receive treatment at a specific level of care ("LOC").  *Id.* at 8-11

        The lowest LOC is provided through the Correctional Clinical Case Management System.  *Id.* at 9.  Inmate patients in this program are relatively stable with mental health symptoms that only require brief intervention.  *Id.*

        The next (second) LOC is the Enhanced Outpatient Program ("EOP").  *Id.*  Inmate-patients in the outpatient program have serious mental disorders or cannot function in the general prison population.  *Id.*  Outpatient program inmates require extensive mental health treatment, but can be managed through outpatient therapy and do not require continuous nursing care.  *Id.* at 9-10.

        The third LOC is the Mental Health Crisis Bed ("MHCB").  *Id.* at 10.  Crisis bed placement is a short-term care program for inmate-patients who require 24-hour nursing care or are considered a danger to others or themselves as a result of a serious mental disorder.  *Id.*  These inmate-patients are generally discharged to a lower LOC if they improve, or are transferred to an inpatient program for more intensive care.  *Id.* at 10-11.

        The fourth LOC is Inpatient Hospital Care, or the Psychiatric Inpatient Program, which is the highest level of mental health care provided by CDCR.  *Id.* at 11, 21.  The CDCR's inpatient programs provide acute and intermediate mental health care.[3]  *Id.* at 21.  Acute mental health care

_____

[3] The CDCR used to provide a Day Treatment Program for inmates that required a higher

consists of short-term, intensive treatment programs for inmate-patients with an acute major mental disorder or an acute exacerbation of a chronic major mental illness. *Id.* at 22-23. Acute care is provided at the California Medical Facility in Vacaville and California Health Care Facility in Stockton. *Id.*; *see also id.*, Ex. D.

Within the inpatient hospital care are facilities called Intermediate Care Facilities ("ICFs"), which provide long-term, 24-hour nursing care and mental health treatment for inmate-patients with serious mental disorders who cannot function adequately at the outpatient program LOC. *See id.* at 26-27; *see also* Mayeri Decl. ¶ 5. Since 2018, CDCR has provided this LOC under the Psychiatric Inpatient Programs at the California Medical Facility, the California Health Care Facility, San Quentin State Prison (for condemned inmates), and SVSP. Wu Decl., Ex. D at 1. The California Department of State Hospitals also provides an equivalent LOC at Atascadero State Hospital and Coalinga State Hospital. *Id.* Because each ICF provides an equivalent LOC, inmate-patients are generally only transferred between different ICFs when they should be transferred into a less restrictive environment to reach their "Least Restrictive Housing" level. *Id.*

### 2.   Harris' Mental Health Treatment at SVSP

On February 12, 2019, Harris was deemed a danger to himself and transferred to SVSP's ICF from another prison. *See* Mayeri Decl. ¶ 9. Harris was placed under the care of his IDTT. *See id.* As mentioned, Dr. Mayeri was part of Harris' IDTT, which also consisted of social worker B. Madron, registered nurse D. Ventura, and post-doctoral intern B. Njuguna (all non-parties). *Id.* While Harris was at SVSP, Dr. Mayeri was the on-call, primary psychiatrist responsible for Harris' care during the week, while the on-call, covering psychiatrist would provide mental health care on most Fridays and every weekend. *Id.*

At the initial assessment, Harris was diagnosed with borderline personality disorder, major depressive disorder, and various drug-use disorders. *Id.* ¶ 6. In its review of Harris' medical history, the IDTT noted that Harris had a history of maladaptive behavior aimed to increase his LOC—in

---

LOC than is provided in EOP, but did not require 24-hour nursing care. Wu Decl., Ex. C at 35. As of 2018, the Day Treatment Program is no longer active. *See id.*, Ex. D at 1.

United States District Court
Northern District of California

particular, Harris would threaten suicide or claim to have auditory hallucinations encouraging him to bang his head. *See* Wu Decl., Ex. B at 20, 102.[4]  According to his previous clinician, Harris would engage in attention-seeking behavior, especially towards female clinicians, as evidenced by his history of indecent exposure. *Id.* at 103; *see, e.g.*, *id.* at 191.  Dr. Mayeri also noted that Harris appeared preoccupied with obtaining specific medications. *See id.* at 32.

The IDTT formulated a treatment plan for Harris, which included a series of antidepressant, anti-anxiety, and antipsychotic medications, group therapy sessions, and regular meetings with the team. Mayeri Decl. ¶ 9; *see also* Wu Decl., Ex. B at 14-17, 33.  Throughout Harris' stay at SVSP, he remained in the ICF and was housed in a single cell. Mayeri Decl. ¶¶ 6, 7.

### 3.   Harris Sought to Acquire Specific Medications (Including Bupropion)

Two days after Harris was transferred to SVSP, Dr. Mayeri met with Harris. *See* Mayeri Decl. ¶ 10.  Harris reported difficulty falling asleep, which he attributed to auditory hallucinations. *Id.*  Harris claimed that when he was provided mental health treatment at other institutions, he would regularly be given significantly larger amounts of haloperidol or Haldol, an antipsychotic medication that Dr. Mayeri prescribed for him at SVSP. *See* Wu Decl., Ex. B at 129.  After discussing the risks, benefits, and side effects of the medication with Harris, Dr. Mayeri agreed to increase the Haldol dosage. *Id.*

When Dr. Mayeri met with Harris again the next day on February 15, 2019, Harris reported feeling anxious but was coping well. *Id.*; see also Mayeri Decl. ¶ 11.  Later that night, after Dr. Mayeri went home, Harris asked to speak with the nurse on duty, claiming he was suicidal and requesting an injection. *See* Wu Decl., Ex. B at 225-26.  The on-call psychiatrist placed Harris into one-on-one observation with full safety precautions and provided Harris with an additional shot of Haldol. *Id.* at 129, 226.  When the on-call psychiatrist interviewed Harris the next day, Harris reported feeling better and requested to return to his cell. *Id.* at 129.  Accordingly, Harris was discharged from the observation room. *Id.*

_____

[4] The court notes that the page numbers for Harris' medical records begin at "AGO00001," but for simplicity these page numbers will be referred to page "1," and so on. *See* Wu Decl., Ex. B.

1    Over the next week, Dr. Mayeri met with Harris several times to inform him that the IDTT

2    would taper him off bupropion (also known as Wellbutrin), an antidepressant drug, and quetiapine

3    (also known as Seroquel), an antipsychotic drug. *Id.* at 127-28. Under the direction of SVSP's

4    then-Chief Psychiatrist, Mark Ritchie, the IDTT aimed to phase out bupropion because the drug can

5    activate mental health patients, causing manic episodes and contributing to psychosis. Mayeri Decl.

6    ¶ 15. The drug was also prone to abuse by inmate patients. *Id.* Indeed, both bupropion and

7    quetiapine were "crushed and floated" when provided to inmates, i.e. crushed into powder and

8    administered in liquid, to minimize the risk of cheeking or palming the medication for later abuse.

9    *See, e.g.*, Wu Decl., Ex. B at 26, 30.

10    When Dr. Mayeri first informed Harris that he would be tapered off bupropion and

11    quetiapine on February 25, 2019, Harris stated that he was agreeable to being tapered off quetiapine

12    because it caused significant weight gain. *See id.* at 127-28. But upon learning that he would be

13    tapered off bupropion, Harris became upset, claiming he would hurt himself if the drug was

14    discontinued. *Id.* Heeding Harris' concerns, Dr. Mayeri delayed the taper so they could first

15    increase Harris' dosage for escitalopram (a selective serotonin reuptake inhibitor ("SSRI") also

16    known as Lexapro) to treat his depression. *Id.*; *see also* Mayeri Decl. ¶¶ 14-15.

17    Two days later on February 27, 2019, Harris became agitated and claimed he was stressing

18    out over his legal matters. Wu Decl., Ex. B at 127, 222. Harris stated he was suicidal, heard voices

19    telling him to bang his head, and asked for injections. *Id.* at 222. Dr. Mayeri provided Harris with

20    intra-muscular injections of Haldol and other medications to calm him down. *Id.* at 127, 222. Dr.

21    Mayeri also placed Harris into one-on-on observation for additional monitoring due to concerns that

22    Harris posed a danger to himself. *Id.* Harris remained in observation until March 1, 2019, after he

23    reported doing well and denied thoughts of self-harm for two days. *Id.* at 126-27, 219-22.

24    On February 28, 2019, while Harris was under observation, Dr. Mayeri began to taper

25    Harris' bupropion dosage. *Id.* at 126-27. Dr. Mayeri slightly decreased Harris' bupropion dosage

26    and increased Harris' dosage for duloxetine, a different antidepressant medication, and his SSRI.

27    *Id.* at 127.

28    Harris began to continually request bupropion from Dr. Mayeri and other psychiatrists,

United States District Court
Northern District of California

6

claiming that no other medications worked. *See, e.g.*, Wu Decl., Ex. B at 125. Dr. Mayeri did not ignore Harris' concerns; he continued to adjust Harris' medication regimen over the next month. *See, e.g.*, Wu Decl., Ex. E (Harris Depo. at 71:10-25 (Harris stating that his IDTT "tried everything.")). On March 4, 2019, for example, Dr. Mayeri adjusted the timing of Harris' tapered bupropion dosage at his request to accommodate his sleeping schedule. Wu Decl., Ex. B at 126. And on March 11, 2019, after Harris had been completely tapered off bupropion, Harris' IDTT agreed to increased his duloxetine dosage and decreased his SSRI dosage after feedback from Harris that the SSRI was not effective. *Id.* at 125; *see also* Mayeri Decl. ¶ 20.

Nevertheless, Harris' preoccupation with acquiring specific medications continued through March 2019. Wu Decl., Ex. B at 125. On March 13, 2019, Harris refused his prescription for oral Haldol. *Id.* Harris claimed he was stressed because he had to prepare for an upcoming deposition and asked for a shot of Haldol instead. *Id.* at 124. He reported hearing voices telling him to bang his head and said he would hurt himself. *Id.* Dr. Mayeri placed Harris under one-on-one observation and provided him with a Haldol injection to calm him down. *Id.*; Mayeri Decl. ¶ 21. The next day, Harris reported feeling better after using his coping mechanisms and was discharged from observation. Mayeri Decl. ¶ 22.

On Sunday, March 17, 2019, the on-call nursing staff responded to an alarm after Harris made four to five superficial lacerations to his left arm using a razor. *See* Wu Decl., Ex. B at 203-04. Dr. Mayeri was not on duty that day because it was a Sunday. Mayeri Decl. ¶ 23. Harris apparently found the razor in the facility yard and custody staff failed to find it during a routine search as he was returned to his cell. *See* Harris Depo. at 48:25-49:7. The IDTT was not involved in that search. *Id.* at 48:3-20. When the nursing staff cleaned the lacerations, Harris reported he had swallowed the razor. *See* Wu Decl., Ex. B at 203. Medical staff notified the on-call psychiatrist, *see id.* at 123, and transferred Harris to an outside emergency room for imaging and further evaluation, *see id.* at 202-03. Harris' x-ray report showed that the swallowed razor blade did not cause any serious injury, and prison staff transported Harris back to SVSP for continued monitoring under one-on-one observation. *Id.* at 202.

The next day, March 18, 2019, Dr. Mayeri met with Harris to evaluate his mental health. *Id.*

United States District Court
Northern District of California

at 123.  Harris stated he felt safe while in observation and requested to remain there.  *Id.*

On March 19, 2019, Harris initially reported to nursing staff that he felt better, but wanted to remain in one-on-one observation.  *Id.* at 194.  Later that day, Harris changed his mind after attending a deposition where he reportedly learned he would be receiving money from a settlement.  *Id.* at 122.  When Dr. Mayeri met with Harris that afternoon to assess his mental health, Harris claimed he felt much better and denied requesting to stay in observation.  *Id.* at 122-23; *see also* Mayeri Decl. ¶ 25.  Accordingly, Dr. Mayeri discontinued Harris' observation.  *See id.*

Over the next month, Harris would routinely request specific medication from the on-call psychiatrist or nursing staff while Dr. Mayeri was off duty during the weekends.  *See, e.g.*, Mayeri Decl. ¶¶ 26-27, 34, 36; Wu Decl., Ex. B at 111-14, 119-120, 122.  When those requests for additional medication were denied owing to abuse or health risk, Harris would claim to have auditory hallucinations telling him to bang his head or threaten self-harming behavior to obtain one-on-one observation and additional medication.  *Id.*  For example, on March 23, 2019, Harris demanded additional doses of Effexor, an antidepressant, from the on-call psychiatrist.  *Id.* at 122.  When the request was denied, Harris claimed he did not feel safe and requested one-on-one observation, which was provided as a safety precaution.  *Id.* at 190.  On March 30, 2019, Harris demanded Ativan, a sedative, from the on-call psychiatrist, who denied the request due to abuse risk.  *Id.* at 120.  Two days later, Harris again requested Ativan from a different psychiatrist and nursing staff, claiming he felt unsafe and stressed owing to family issues.  *See id.* at 119-20, 172.  Harris was provided medication and again placed in observation as a precaution.  *Id.*

Throughout April and May 2019, Harris continued to display a similar pattern of behavior to acquire brief placements in one-on-one observation and additional medication.  Mayeri Decl. ¶¶ 27, 34, 36, 41, 44; Wu Decl., Ex. B at 108-09, 111-114.  And each time, Harris would report feeling better in follow-up assessments with Dr. Mayeri, who would discharge him from observation.  *See* Mayeri Decl. ¶¶ 28, 31, 42, 45.

Dr. Mayeri continued to evaluate and adjust Harris' medication to address his repeated claims that his medications were not working.  *Id.* ¶ 29.  On April 4, 2019, Dr. Mayeri adjusted Harris' antidepressant dosages after discussing the risks, benefits, and potential side effects of those

medications when Harris claimed that the current dosages were insufficient to treat his depression. *Id.*; *see also* Wu Decl., Ex. B at 118.  Dr. Mayeri also discontinued Harris' regular prescription for oral Haldol and replaced it with Olanzapine, another antipsychotic medication, after Harris claimed that Olanzapine worked better for him than Haldol.  *Id.*  But on April 18, 2019, Harris expressed a preference for Haldol over Olanzapine because the latter caused weight gain, and Dr. Mayeri again adjusted Harris' medication regimen accordingly.  Mayeri Decl. ¶ 33; Wu Decl., Ex. B at 114-16.  Dr. Mayeri also adjusted Harris' anti-anxiety medication to assist with his sleep.  *Id.*  And on May 8, 2019, Dr. Mayeri again adjusted Harris' anti-anxiety medication after Harris complained.  Mayeri Decl. ¶ 43; Wu Decl., Ex. B at 109.  However, Harris consistently resisted all changes to his medication regimen and instead continued to seek bupropion.  Mayeri Decl. ¶ 40; *see also* Wu Decl., Ex. B at 111.  For example, on May 1, 2019, Dr. Mayeri offered to adjust Harris' medications after he claimed his medications were not working; Dr. Mayeri offered to: adjust Harris' antipsychotic medication, adjust his antidepressant medication, and prescribe lithium.  *Id.*  Harris refused all changes and continued to request bupropion.  *Id.*

### 4.   Harris Was Enrolled in Dialectical Behavior Therapy Groups

Upon his admission to SVSP's ICF, Dr. Mayeri noted that Harris had previously requested enrollment in dialectical behavior therapy ("DBT").  *See* Mayeri Decl. ¶ 8.  DBT is a type of cognitive behavioral therapy that aims to help patients identify and change negative behavior and thinking patterns.  *Id.*  At his first IDTT meeting, the team agreed that DBT could help Harris and enrolled him in two DBT programs.  *See id.* ¶ 9; *see also* Wu Decl., Ex. B at 68.  Over the next three months, Harris' IDTT kept him enrolled in various DBT groups and other similar therapeutic groups to address his mental disorders.  *See*, *e.g.*, Wu Decl., Ex. B at 259-60 (therapy group teaching coping skills), 261 (substance abuse group using DBT skills).

Harris' attendance at group therapy sessions was sporadic.  For example, on February 26, 2019, Harris attended his first DBT group, *see* Wu Decl., Ex. B at 269, but then failed to attend his second session on March 12, 2019, *see id.* at 262-63.  Harris missed another DBT session on the morning of April 2, 2019, after he sought placement in one-on-one observation.  *See id.* at 257-58.

United States District Court
Northern District of California

And on April 3, 2019, after he was discharged from observation the previous evening, Harris refused to attend either his DBT substance abuse group or his DBT mood management group. *See id.* at 253-55. Despite his occasional refusals to attend group therapies, however, Harris remained enrolled in DBT groups until he was transferred to another prison. *See id.* at 231-32 (noting attendance at DBT group on May 7, 2019).

In late April 2019, Harris was also referred to a staff psychologist to complete a behavior chain analysis, a type of cognitive behavioral therapy aimed to help Harris identify the triggers for his head-banging and provide him with the tools to prevent that behavior. *See* Mayeri Decl., Ex. A at 2-4. In that one-on-one analysis, Harris identified family issues involving his brother as stressors contributing to his head-banging. *Id.* at 3. Notably, Harris did not mention auditory hallucinations in the chain of events contributing to his head-banging. *Id.* at 2. Harris was encouraged to attend his DBT groups and practice skills learned in those groups to regulate his emotions and prevent self-harm. *Id.* at 4.

### 5.    Harris Was Discharged to EOP (Lower LOC)

In April 2019, Dr. Mayeri requested a forensic assessment of Harris' symptoms to screen for malingering behaviors. Mayeri Decl. ¶ 37; *see also* id., Ex. A at 1, 5-8. On April 30, 2019, staff psychologist Dr. Mark Lee conducted a Miller Forensic Assessment of Symptoms Test ("M-FAST") for Harris. *Id.*, Ex. A at 5-8. Dr. Lee, a non-party, was not part of Harris' regular IDTT. *See* Harris Depo. at 46:18-22. Dr. Lee found that the test was "highly suggestive of malingered psychopathology." Mayeri Decl., Ex. A at 8. He noted that Harris appeared to exaggerate his mental health symptoms. In addition, although Harris claimed to experience severe levels of auditory hallucinations, he displayed none of the typical signs of auditory hallucinations—behavior which was corroborated by other medical and mental health staff. *Id.* at 7-8. Similar inconsistencies in Harris' symptoms had been noted by other staff. *See, e.g.*, *id.* at 2-4 (clinical psychologist Dr. Saldivar noting that Harris did not mention auditory hallucinations during therapy designed to identify triggers for self-harm).

Following these assessments, Harris' IDTT concluded that discharge to an EOP (a lower

LOC) was appropriate because his continued enrollment in an inpatient setting was only reinforcing negative behaviors. *See* Mayeri Decl. ¶ 39; *see also* Wu Decl., Ex. B at 1-2, 44. In particular, Dr. Mayeri noted in his May 2, 2019 discharge summary notes that Harris was resistant to implementing the coping skills taught by his therapy sessions, including two DBT groups. *See* Wu Decl., Ex. B at 2. Dr. Mayeri also noted that Harris was fixated on bupropion and resisted the medication regimen provided by his IDTT. *Id.* Likewise, Harris' IDTT noted that, after being told he did not qualify for a transfer to a state hospital, Harris repeatedly engaged in self-injurious behavior and endorsed suicidal ideation nearly every weekend to fabricate evidence that he required a higher LOC. *Id.* at 44. When the team referred Harris for a behavior chain analysis to provide him with more targeted coping skills, Harris refused to implement any such skills and insisted that nothing but medications would work. *Id.* Combined with the M-FAST assessment, Harris' IDTT concluded that discharge to an EOP was appropriate. *Id.*; *see also* Mayeri Decl. ¶ 39.

On May 15, 2019, Harris' IDTT referred his case to the Coordinated Clinical Assessment Team for a second opinion. Mayeri Decl. ¶ 46; Wu Decl., Ex. B at 271, Ex. D at 2. The assessment team included psychologists and psychiatrists at the CDCR's inpatient reporting unit headquarters, the mental health program coordinator, and other members of the SVSP Psychiatric Inpatient Program staff. *Id.* In their discussion, the assessment team noted that Harris appeared fixated on being transferred to a state hospital, getting enrolled into a specific DBT program at the California Medical Facility, and acquiring specific medications—all of which were likely motivating his reports of suicidal thoughts and claims of auditory hallucinations. *Id.* The assessment team concluded that discharge to an EOP was appropriate because keeping Harris in an inpatient setting was reinforcing his maladaptive strategies. *Id.* Accordingly, Harris was discharged to an EOP and transferred out of SVSP's ICF on May 17, 2019. Mayeri Decl. ¶ 47.

### VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the complaint occurred in Monterey County, located in the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over

1    this action under 42 U.S.C. § 1983.  *See* 28 U.S.C. § 1331.

2

3                                    **LEGAL STANDARD**

4           Summary judgment is proper where the pleadings, discovery, and affidavits show that there

5    is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as

6    a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who

7    fails to make a showing sufficient to establish the existence of an element essential to that party's

8    case, and on which that party will bear the burden of proof at trial . . . since a complete failure of

9    proof concerning an essential element of the nonmoving party's case necessarily renders all other

10   facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it

11   might affect the outcome of the suit under governing law, and a dispute about a material fact is

12   genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

13   party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

14          Generally, as is the situation with defendant's challenge to the Eighth Amendment claim,

15   the moving party bears the initial burden of identifying those portions of the record which

16   demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving

17   party to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to

18   interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

19   issue for trial.'"  *Celotex*, 477 U.S. at 324.

20          When a defendant moves for summary judgment on an affirmative defense on which he

21   bears the burden of proof at trial, he must come forward with evidence which would entitle him to

22   a directed verdict if the evidence went uncontroverted at trial.  *See Houghton v. South*, 965 F.2d

23   1532, 1536 (9th Cir. 1992).

24          The court's function on a summary judgment motion is not to make credibility

25   determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W.

26   Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence

27   must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn

28   from the facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at 631.

United States District Court
Northern District of California

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  Harris' complaint was made under penalty of perjury and therefore will be considered as part of his opposition to the motion for summary judgment.

## DISCUSSION

In its January 20, 2021 order of service, the court found that, liberally construed, the complaint stated a cognizable § 1983 claim against Dr. Mayeri for violating Harris' rights under the Eighth Amendment.  *See* Docket No. 7.

A.    Mental Health Care Claim

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).  To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

To satisfy the objective prong, there must be a "serious" medical need.  A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury" or the "'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

For the subjective prong, there must be deliberate indifference.  A defendant is deliberately

United States District Court
Northern District of California

indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*). There must be "harm caused by the indifference," although the harm does not need to be substantial. *See Jett*, 439 F.3d at 1096.

A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (summary judgment for defendants was properly granted because plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to proper course of care where prison medical staff treated his recurring abscesses with medicines and hot packs). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (second alteration in original).

Here, as a threshold matter, there is no dispute that Harris had a serious medical need (for the subjective standard) based on his mental health problems. The need to provide psychiatric care requires that prison officials monitor detainees whom they know are suicidal. *See Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1018 (9th Cir. 2010) *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc). "[A] heightened suicide risk can present a serious medical need." *Simmons*, 609 F.3d at 1018 (citation omitted). Defendant appears to concede that Harris had a serious medical need while he was at SVSP's ICF. *See* Docket No. 17 at

16-18.

The case of *Cano v. Taylor*, 739 F.3d 1214 (9th Cir. 2014), is very similar to the present case. In *Cano*, the prisoner claimed that he had not received proper care for his mental illness, with the result that he became suicidal. The Ninth Circuit upheld summary judgment for the defendants because of the ample evidence that Cano had received mental health care. There were prison health care records showing that Cano was seen by mental health care employees regularly for his complaints, e.g., evidence of numerous visits by psychologists and psychiatrists over a three-year period, "a great deal of evidence that his suicide threats were manipulative in nature," and evidence that "during follow-up visits to his cell, Cano's chief complaint was boredom, and he sought a television and radio in his cell." *Id.* at 1217-18. The record also disclosed that Cano was an uncooperative and difficult patient, and that the violent and threatening behavior he often exhibited meant that he could not be placed in a lower custody part of the prison. *Id.* at 1218. There also were "countless forms in the record demonstrating follow-up by staff, including cell-front visits to check on Cano's mood, continuous progress reports, psychiatric follow-ups, mental health treatment plans, and watch discharge summaries." *Id.* The Ninth Circuit concluded that, on this record, no reasonable trier of fact could find that there was deliberate indifference to Cano's complaints about his mental health needs. *Id.*

As in *Cano*, the numerous medical records in the present case—270+ pages of records generated in just a three-month stay at SVSP's ICF—shows that Harris received numerous evaluations by doctors (including Dr. Mayeri), therapists and nurses, and received medications throughout his stay at SVSP. *See* Wu Decl., Ex. B at 1-270. Also as in *Cano*, the records show that SVSP's mental health and custody staff thought Harris displayed manipulative behavior, i.e., manipulating health care staff with threats of self-harm or suicide to gain placement in one-on-one observation and garner attention or medication. *See id.*, Ex. B at 20, 102, 125-129, 191.

On the evidence in the record, defendant is entitled to summary judgment on Harris' claims that Dr. Mayeri were deliberately indifferent to his mental health needs. As mentioned, the evidence in the record suffices to allow a jury to conclude that Harris' mental health problems presented a serious medical need. However, this is not so for the subjective prong. Even viewed in the light

most favorable to Harris, the evidence in the record does not suffice to allow a rational jury to conclude that Dr. Mayeri was deliberately indifferent to Harris' mental health care needs. That evidence shows the following: As soon as Harris arrived at SVSP, he was placed in the highest level of mental health care—the Psychiatric Inpatient Program at SVSP's ICF—while being treated by Dr. Mayeri. *See* Mayeri Decl. ¶ 6; see also Wu Decl., Ex. B at 14 (initial placement in SVSP's ICF), 37-86 (continued placement in the SVSP's ICF). Harris was seen regularly by Dr. Mayeri, and in fact at Harris' deposition, he estimated that Dr. Mayeri "[saw] him more than probably every [other inmate at SVSP.]" Harris Depo. at 52:6-11. Harris was provided constant attention from Dr. Mayeri and his IDTT multiple times a week to: adjust his medications, attend group therapies, and address other mental health issues as they arose. *See generally*, Mayeri Decl.

The court also turns to Harris' specific deliberate indifference claims relating to Dr. Mayeri's: failure to place Harris in one-on-one observation (before his March 17, 2019 suicide attempt); failure to keep him away from sharp objects; and decision not to provide him with buproprion. *See* Docket No. 1 at 3-4.

First, Harris' claim that Dr. Mayeri "prematurely and inappropriately discharged [him]," *see* Docket No. 1 at 4, could be construed as a challenge to Dr. Mayeri's decision to discharge him from one-on-one observation a few days before his suicide attempt on March 17, 2019, *see* Docket No. 7 at 2. However, the undisputed facts demonstrate that Dr. Mayeri was neither subjectively aware of any acute danger to Harris' health nor did Dr. Mayeri consciously disregard any such danger.

Just like *Cano*, another Ninth Circuit case, *Simmons v. Navajo County*, is instructive because it has some similarities to the present case. In *Simmons*, the Ninth Circuit affirmed the district court's order granting summary judgment for the defendants. *See* 609 F.3d at 1018-20. One of the defendants, a nurse at an Arizona county jail, determined that Simmons was a suicide risk and initially placed him under constant observation. *Id.* at 1015. While Simmons was under observation, he was evaluated regularly and consistently denied having suicidal thoughts. *Id.* The nurse accordingly downgraded Simmons' status and removed him from being under constant observation. *Id.* However, after a few weeks, Simmons committed suicide by hanging himself with a rope fabricated from medical gauze. *Id.* at 1016. Holding that the decedent's family failed to

demonstrate deliberate indifference on the part of the nurse, the Ninth Circuit emphasized that the plaintiffs were required to "demonstrate a subjective awareness of a substantial risk of *imminent* suicide." *Id.* at 1018 (emphasis in original). The Ninth Circuit further noted that "[t]here [was] no indication that in the hours before [Simmons'] suicide, [the nurse] 'observed suicidal actions, heard statements of a suicidal nature, or witnessed other evidence of [Simmons'] suicidal intent' that would have alerted her to [Simmons'] impending suicidal crisis." *Id.* (quoting *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1246 n.4 (9th Cir. 2010) *overruled on other grounds by Castro*, 833 F.3d at 1070). Rather, the nurse was off duty and could not have observed the inmate's behavior. *Id.* And the nurse's belief that the inmate "was at some risk of suicide warranting continuing precautions" was not enough absent "evidence that [she] was subjectively aware that [Simmons] was actively suicidal at the time [she] left [her] shift." *Id.* at 1019 (quoting *Clouthier*, 591 F.3d at 1247).

Here, Dr. Mayeri discharged Harris from one-on-one observation on March 14, 2019 after Harris denied thoughts of suicide or self-harm and reported that he was doing better. *See* Wu Decl., Ex. B at 124, 206-07. Over the next two days, Harris continued to receive intermediate inpatient care through SVSP's ICF without incident. Just like in *Simmons*, no evidence exists showing that Dr. Mayeri (or any other staff) "observed suicidal actions, heard statements of a suicidal nature, or witnessed other evidence" of Harris' suicidal intent that would have alerted Dr. Mayeri to Harris' "impending suicidal crisis." 609 F.3d at 1018. And, as in *Simmons*, Dr. Mayeri was not on duty on March 17, 2019 (which fell on a Sunday) when Harris attempted suicide with a razor, and thus Dr. Mayeri could not have observed Harris' behavior leading up to the attempt. *Id.* The fact that Harris had been placed under one-on-one observation before is insufficient to demonstrate that Dr. Mayeri had a subjective awareness of substantial danger. *See id.* ("Placing a pretrial detainee on some level of suicide watch, even the highest level, does not demonstrate a subjective awareness of a substantial risk of *imminent* suicide.") (emphasis in original) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 990 (7th Cir. 1998)).

Next, the court also finds unavailing Harris' claim that Dr. Mayeri failed to keep him away from sharp objects. In his deposition, Harris testified that razors are contraband items, *see* Harris

United States District Court
Northern District of California

1  Depo. at 47:18-23, and it was the sole responsibility of custody staff to ensure he did not have those

2  items, *see id.* at 47:24-48:20.   No evidence exists showing that Dr. Mayeri knew Harris illicitly

3  obtained a razor and consciously disregarded the risk the razor posed to Harris' health.   *See*

4  *Simmons*, 609 F.3d at 1019 ("No reasonable jury could thus conclude that [the nurse] consciously

5  disregarded an excessive risk to [Simmons'] safety" when there was "no evidence in the record . . .

6  that she was even aware that [Simmons'] had accumulated the gauze.").   To the contrary, the

7  evidence demonstrates that Harris had a history of making threats of self-harm or suicide that were

8  manipulative in nature, i.e., to gain placement in one-on-one observation and garner attention or

9  medication.   *See* Wu Decl., Ex. B at 20, 102, 125-129, 191.   No indication exists in the record

10  showing that Harris was in an impending suicidal crisis and not simply continuing his pattern of

11  maladaptive behavior.   *See Cano*, 739 F.3d at 1217 (inmate's placement on suicide watch fifteen

12  times over sixteen months owing to threats of self-harm was evidence that his suicide threats were

13  manipulative in nature).   And, in any case, medical staff on duty provided immediate care after

14  Harris superficially cut his wrists and swallowed the razor.   *See* Wu Decl., Ex. B at 123, 203-04.

15  Finally, Harris claims that Dr. Mayeri failed to properly treat his mental disorders by tapering

16  him off bupropion.   Docket No.1 at 3; *see also* Harris Depo. at 19:10-20:25.   But on the record

17  before the court, no rational jury could find an Eighth Amendment violation.   No evidence has been

18  presented by Harris showing that bupropion was the only effective or appropriate medication.   The

19  record shows that Harris was on bupropion when he was deemed a danger to himself *before* his

20  admission to SVSP's ICF.   *See* Wu Decl., Ex. B at 14-19.   Harris conceded at his deposition that he

21  had suicidal thoughts while he was taking bupropion.   *See* Harris Depo. at 38:16-22.   Thus, Dr.

22  Mayeri's chosen course of treatment was reasonable under the circumstances, and his actions do not

23  amount to an Eighth Amendment violation.   *See Toguchi*, 391 F.3d at 1058.   Ultimately, Harris has

24  managed only to show a difference of opinion about the adequacy of the mental health care treatment

25  he received at the prison.   Showing only a difference of opinion does not defeat defendant's motion

26  for summary judgment on his Eighth Amendment claim.   *See id.*; *Sanchez*, 891 F.2d at 242.

27  In sum, Harris has failed to show a genuine issue for trial in support of a claim that Dr.

28  Mayeri was deliberately indifferent to Harris' mental health needs.   Thus, viewing the evidence in

18

the light most favorable to Harris, no reasonable jury could return a verdict against Dr. Mayeri on Harris' Eighth Amendment claim.

B.    Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. The inquiry of whether a constitutional right was clearly established must be undertaken in light of the "specific context" of the case, not as a broad general proposition. *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Pearson*, 555 U.S. at 236 (overruling *Saucier*'s requirement that qualified immunity analysis proceeds in a particular sequence). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City and Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015) (alteration and omission in original) (citation omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original) (internal quotation marks omitted).

For an Eighth Amendment violation based on a condition of confinement (such as a mental health care need), the official must *subjectively* have a sufficiently culpable state of mind, i.e., he "'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity." *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. at 834, and citing *Saucier*, 533 U.S. at 205). Although the general rule of deliberate indifference had been expressed in *Farmer*, no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" *Estate of Ford*, 301 F.3d at 1051 (quoting *Farmer*, 511 U.S. at 834 n.3). Because it had not been fleshed out, "it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm. *Farmer* left that an open issue. This necessarily informs 'the dispositive question' of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they] confronted." *Estate of Ford*, 301 F.3d at 1051. Each of the defendants in *Ford* was entitled to qualified immunity even though he was aware of some information that there was *some* risk in double-celling the violent inmate with the decedent or any other inmate.

As in *Estate of Ford*, the present case involves a situation where the general Eighth Amendment duty is well-known but the particular obligations for correctional staff in certain situations are open for debate. There is caselaw holding that unnecessary delay in providing medical care may amount to deliberate indifference, *see, e.g., McGuckin*, 974 F.2d at 1062, but the cases have not fleshed out just how quickly an officer must summon mental health care staff when an inmate requests mental health care. Nor have the cases fleshed out the requirements for prioritizing requests for mental health care when the inmate is at the time engaged in misbehavior that may or may not be a product of his mental illness.

Here, Dr. Mayeri is entitled to qualified immunity against the deliberate indifference claim.

The evidence in the record does not establish a violation of Harris' Eighth Amendment rights based on Dr. Mayeri's responses to Harris' requests for mental health care. Defendant prevails on the first prong of the *Saucier* analysis. Even if a constitutional violation had been shown, however, defendant would prevail on the second prong of the *Saucier* analysis. Dr. Mayeri determined that Harris' requests for mental health care all appear to be a product of his mental illness: borderline personality disorder. *See* Mayeri Decl. ¶¶ 39, 46. Thus, a reasonable medical staff member in Dr. Mayeri's position would not have understood that it would be unlawful to determine that Harris' repeated claims of suicidal or self-harming thoughts were likely the result of his maladaptive behaviors, motivated by his desire to get transferred to a facility with less restrictive housing, to obtain specific medication, or to generate attention. *See id.* The law is not clear as to the extent Dr. Mayeri was required to credit Harris' claims and acquiesce to his specific treatment demands, particularly when the IDTT and Coordinated Clinical Assessment Team agreed with Dr. Mayeri's assessment, and also especially when Dr. Mayeri was aware that Harris was receiving ongoing mental health care at the highest LOC—the Psychiatric Inpatient Program at SVSP's ICF. *See id.* ¶¶ 6, 8, 9, 20, 30, 46; Wu Decl., Ex. B at 55, 72-73, 271. Therefore, defendant is entitled to judgment as a matter of law on the qualified immunity defense for Harris' Eighth Amendment claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. Docket No. 17. Defendant is entitled to judgment as a matter of law on Harris' complaint.

The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: March 16, 2022

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

21